Thank you. May it please the court. My name is Daniel Drake. I'm an attorney from Phoenix. I will take the first five minutes of argument, reserving one of them. Can you point that microphone to your mouth and speak up a little bit? Is that better? Better. All right. I will try to speak more loudly. For my benefit. I'm the one that doesn't hear very well, so thank you. Well, you've got a big voice. Anyway, I'm going to save one minute for rebuttal and use four minutes. Mr. Dichter will follow and address the second issue, the ineffective assistance of counsel claim. Okay. This is a Ponzi case, and that's what the government argued. It took it 17 lines to get into it in opening statement. What it did not involve, however, in this case was any evidence about a real business, that there were real assets that had value. And so because of that, any testimony about measures that were made to ensure that this business ran fairly, that there were compliance officers, there were accountants, there were auditors, all those things really meant nothing. Mr. Drake, one of the problems I have with that argument is, as I understand it, the fund raised somewhere around $130 million. Is that right, give or take? It was quite substantial. Okay. But the evidence showed that an awful lot of that money was used to fund loans to what the evidence suggests were shell corporations, which then obtained additional loans to pay off the original loans. So why isn't this like a Ponzi scheme, where new money is being repaid to investors who got in first? All right. The basic concept of a Ponzi scheme is that you get money and you don't have a real business. It is simply a method to take new money to pay old, with no underlying assets. There were underlying assets here of viable business. Well, but the assets came from the investors. And I guess what I'm looking for here, aside from using some of the money to buy real estate that obviously would have some value, depending on what the real estate market is at the time, the investors were being promised these exorbitant rates of return, 50%, 100% return on the investment. But the money was actually coming from the new money that came in. I mean, isn't that a classic Ponzi scheme? What am I missing here? Well, again, I come back to the value. And, yes, there were payments that were made from old investors or, sorry, payments made to old investors from new investors. And the new investors, in some degree, knew that they were going to take out some of these other investors. That happened, for example, in the Bodell situation and things of that sort. But we come back to this basic issue of what is the harm? What is the harm in letting the defendants establish that there were some value here, that there were real assets, things of that sort? The harm is that you have to give an instruction. But you weren't precluded from doing that, were you? If you read the judge's order, you would think that. If you read the judge's transcript of the opening statements. Well, I did read the judge's transcript, and I didn't see it. So since you now have finally provided us with a copy of the transcript, it wasn't the excerpts, right? But let's go over it chapter and verse. So I've got the transcript. You tell me what page and what line supports your view. Okay. Just so we're all on the same page, literally, I have something with S-E-R and a five-digit number at the bottom. Right. You give me a page number and a line number. Okay. I'll begin with S-E-R 869, and I'll start. Hold on a second. 869. Give me a chance to get over there. Okay. And now line. And I'll begin with line 14 through line 19. And that's where Mr. Jones, defense lawyer, explains to the court that it's essential to present this evidence. Otherwise, it's just a big failure. And what's the jury going to think when it gets a big failure? Let's move now to S-E-R 872. Okay. It begins at line 7. The court. If you wish to pursue this in opening with specifics, you run the risk that I'm not going to allow you to get into it in your case. So that's your case. He goes on and warns them again at line 14 that we talked about this and I'm not going to get into it. I've ruled, and that's it. He goes on in line 21. That's a risk you can take. You skipped line 17. Pardon me? You skipped line 17. You just sort of skipped over it. Yes, I did skip over line 17. Why don't you — what does line 17 say? Discussed especially this morning, and I'm telling you, you may get into this now if you want to. All right? Well, there's no to. It's just want. I'm sorry. Okay. So the judge says you can get into it. Right. Where does he preclude you from getting into it? He says that's the risk you can take if you — Right. All right? He says you're going to have to tie it up, but judges, trial judges, do that all the time. A trial is, you know, you can't have everything coming in at the same time, and judges often say, well, I don't see how this fits in now. I will let it in provisionally, but if you don't tie it up at the end, I may strike it. I mean, you're a trial lawyer. You must have had rules like that, right? Right. I'm sure Judge Pearsall does that from time to time. I have. Judge Tolman has. What's wrong with that? I mean, the judge is not clear about your theory. He's saying, look, if you want to get into it, you can get into it. I'm not precluding you, but be aware that you're going to have to tie it up. If you don't tie it up, I may strike it. I mean, this seems perfectly reasonable, and it certainly does not, and given the district judge's limineal order, which says nothing about this. Right. I don't see where you have a preclusion. I mean, your entire argument is based on a preclusion that I just don't find in the record. Okay. Well, let me go on for a second. Where does a judge say no, not admit it? You know, I will not admit the evidence. I can't point you to that right now. What I can point you to. It's the heart of your case. This is what you are arguing here, and you can't point out to me where the judge says the evidence is excluded? What's the point of standing there and arguing the importance of the evidence if you can't point to me to some place where the judge actually excludes it? The judge made it clear, Your Honor. And I've stood in front of other judges who have made it clear to me with words like this that this is an area that I ought not go into, that I ought to stay away from this, that it's a risk that I'm going to take. It looks to me, I can't speak for my colleagues, but to me, looking at the language, it looks to me like the judge was telling you it's in your ‑‑ it's your judgment. It's your professional judgment. You should be aware of the consequences. If you get into something that you can't later tie up, I may strike it. This is a kind of judgment that lawyers are required to do every day in courtrooms. There were repeated instances, and we cited these in our opening brief. There were repeated instances where they would draw close to this issue and there would be an objection. And the judge would remind the defense that this was ‑‑ Is there something in your brief that points to an actual prohibition? There are. If I can save something for rebuttal, I'd like to find those and get back up. Before you sit down, Mr. Drake, could you explain to me? I'm looking at SER 137, starting at line 3 down to line 25. It's the colloquy with the court with regard to denying the motion for mistrial. And as I read that colloquy, he was essentially saying, look, if you want to pursue this for the losses, I'll let you get into that. But you're doing so, as Judge Kaczynski pointed out, at your risk. Because part of the problem with that defense, as I see it, is that it doesn't address what happened before the conservatorship, which is the heart of the government's theory of fraud, that material misrepresentations were made to induce the investors to part with their money at the very beginning. And so the question in the court's mind, as I read that transcript, is how do you tie in the defense that the conservator is responsible for all these losses when it doesn't address the question of the truth or falsity of the representations made prior to the investors to get them to part with the money? It all goes to the intent to defraud and whether these gentlemen had an intent to defraud, to deceive, to run some business other than what they were going to. But if the conservator just completely violated every fiduciary duty that he owes to the estate in the manner in which he wrapped up the affairs of the corporation, how does that address the truthfulness of the representations that were made years before to the investors to get them to enter into this investment? In many instances, and my time is up and Mr. Dichter is there, but in many instances, Your Honor, the investors made their own choices whether to get in this. There was an attorney by the name of Drake. But the choice has to be informed. And if the investor is not truthfully informed, then our case law says that's no choice at all. There was an investor by the name of – I mean a lawyer by the name of Drake who came down to the offices and sat there and reviewed the evidence. He went back and he told his clients, I don't think I'd do this anymore. I'd get out of this. His clients put more money in over the lawyer's comments. That's what happened in this case. That's the way this happened, and that's what we talked about in terms of the greed of these people trying to get into this thing and get rich at it. Was there ever an offer of proof made by the defense lawyer with regard to what evidence he wanted to get in that wasn't getting in? No, I don't think the court got into that because of this issue of specifics. He was concerned about not getting into specifics and not delaying the trial. Yeah, but you do that out of the presence of the jury. To the court, so you make your record. It wasn't done, was it? You're right. It's something that's often done, and it should be done. It was not done in this case. As I said, the court didn't seem interested in it. Wasn't the thrust of what you wanted was that the conservative said that it was worth $60 million, whatever was left, and that the conservative wound up getting about $30 million for what he said was worth $60, and that's part of what they were trying to get in. Is that right? There was a challenge to what the conservative did. They disagreed with his assets, and to the extent that the judge could have parsed some of this out and taken part of it and said, okay, you can get this in, but you can't get this in, it would have been worthwhile. It would have left them with a defense. It would have left them with a good-faith instruction that would have told the jury, it's not a defense to intend to repay. Okay? And so I say at the end, what's the harm in this, in keeping it out? Was there ever a theory of defense or instruction proposed by the defense? Because the claim partly is that you really don't have any defense with the way that the judge ruled. So did the defense propose a theory of defense instruction? I normally give such an instruction when I'm trying this kind of case. I can't answer that. I'm sorry. All right. Thank you. Mr. Dictor, do you want to take some time? Okay. We'll give you two minutes. Thank you very much, sir. May it please the Court, Steve Dictor. My client's lawyer couldn't read. I mean, that's the start, the finish, and the end. If we were to take the government's approach, and the sides don't disagree really on what the standard is, the record sufficiently developed, was it objectively reasonable, would it have made a difference? If you didn't decide this issue here and sent it back down for a habeas in a year or two years or whatever it will take to get back up here, my guy stays in prison another two years or so, and the only thing that would be new is that his condition never improved, he was eliminated from the Federal panel, and he's retired to mess around in sailboats, and we can leave it for whether it's a better end than before. He couldn't read. He couldn't absorb. And it's not like this was sort of a philosophical thing. This is a neurological thing, attested to by Michael Powers, who's one of the premier neurologists in town. He had suffered from this for 30 years, right? No. No, he'd suffered it for about a year. He had suffered from cross-vision. But, you know, like 30 years ago, I was in a lot better shape than I am now. And I didn't have cataracts 30 years ago, and I had them until they were eliminated. His medical condition deteriorated. We don't need the full medical history on you. Thank you. Believe me, it's nowhere near that. Let's not get into some of the other things. His condition worsened. His condition was bad enough at the first trial. We have a district judge who's presiding over the trial and says, I've observed him, and he was fine. So what do you make of that? I make that he's not a doctor, and I make that he's not a ñ and he tried to be a bit of a psychiatrist and gave him a pep talk and said, you know, this is just how it is for criminal defense counsel. He'd never been a criminal defense counsel, but he said, this is just how it is. And the point of this is, is he didn't know Dennis Jones for 40 years like every other judge in Phoenix, Arizona did, that did criminal work. Jones was an honorable and an honest and a really good defense lawyer for a long, long time. And what happened? He couldn't read. So what's the judge doing contradicting Dr. Powers? He, I submit, his colleagues said in the first trial, this is like Groundhog Day. Well, what does that mean? It means that Jones keeps repeating and repeating and repeating and repeating the same thing. The paralegal appointed by the Court, not connected with Jones, gave an affidavit as to his performance. This is, as Judge Pearsall said in citing really to Strickland in Waddell v. Weber, which was a 2003 case of yours, the Court's confidence in the outcome of the trial has been underlined. There is a reasonable probability, but for the unprofessional error, in that case not getting a cause of death expert, the result would have been different. The guy couldn't read. There were 5,000 exhibits in this case. He couldn't even take the first trial transcript and read the questions to the witnesses, and we have affidavits to that extent. This is to end up, and I really appreciate the time, instead of dealing with the counsel's well-founded concerns as to his medical ability to adequately defend his client, and instead, after giving an in-trial, doctor-filled diagnosis and a pep talk and directed that he proceed, one might say, in the words of a recent commentator on our criminal justice system, drawing on the words of a 19th century Boston barkeep, one Michael T. McGreedy Nuff said. He couldn't read. What do we expect? He could not read. Thank you. Thank you. We'll hear from the government. Thank you. Thank you. May it please the Court. My name is Dominic Lanza. I represent the United States. I want to start in with the first issue having to do with the purported evidentiary ruling. I think the Court hit the nail right on the head. There was no exclusion of evidence, and I want to, in their reply brief, the defense put a lot of emphasis on the January 2 transcript, and we then submitted the supplemental excerpts to provide the Court with the full transcript from that hearing, and I think there's two reasons why the defense isn't aided by their reliance on January 2, and I'll call them context and chronology. Context. The defense in the reply brief cited very narrowly some out-of-context statements when Mr. Jones, in his opening, tried to get into post-conservatorship events, and I stood up and said, Objection, based on your ruling. If the Court looks at the entire transcript we provided in the supplemental excerpts, it's very clear that Judge Zuhari went on the record before opening started and said, I want to memorialize for the record that for purposes of opening statement only, we are not going to get into specifics on what happened after the conservatorship, and that's reflected in multiple places in the actual transcript from January 2. On page 872 and 873, when all this objection was going on, I then explained, the solution was that even though we might be able to get into this later, we decided it's not fair game in opening. And then the Court, there's several places where Judge Zuhari says, well, when the time comes, we'll figure out whether all this is going to come in. So just based on January 2 alone, the judge wasn't coming anywhere close to making a for-the-rest-of-trial exclusionary ruling. He was simply saying, as judges do, the Court hit on, openings aren't the place to get into evidence that might have very nuanced 401 and 403 things that need to be decided in the context of the actual trial. And that's all the Court was doing. He was saying, we might get into this later. If you want to get into it now, you're at your peril. And the peril is if I ultimately decide that you're not going to be permitted to inquire in this area, you will have represented to the jury that your defense case is going to show this, and at the end of the case, the government's going to be able to come back and say, he promised you an opening, but where's the beef? Exactly. And that's a very common ruling that trial counsel deal with all the time. You need to make tactical judgments about how far you're going to go in opening based on what you think you're going to get into later. And I want to turn second from context to chronology. Separate from all of that, this happens on January 2. The matter that we cited in our brief happens the next day, now that the trial has actually begun and evidence is coming in. That's the transcript that got referenced when defense counsel is up there, where Judge Zuhari says, if you want to get this stuff in about Sel, get it in. I'll allow you to do it. So whatever ambiguity may have been created by the comments during opening statement, the January 3 comments later during trial were utterly unambiguous. The judge said, you can put this in if you want. So there was simply no exclusion. Now, separate from whether the issue is preserved, I just wanted to amplify on a point that Judge Tallman was touching upon and also Judge Pearsall, you know, what is the evidence, even though they didn't make an offer of proof, that it would have showed. Perhaps conservator Sel could have gotten more money for the collateral. That fact has very little, if any, relevance to the things that were actually contested in this trial. Whether or not conservator Sel should have got $60 million or more doesn't enable somebody running an investment fund to lie about the fact that their in-house counsel has been debarred. It doesn't allow them to lie about the fact that they say they have a $20 million insurance policy and they just don't have one. Whether or not you have the most collateral in the world and you're a solvent investment fund, you can't tell people I've made 300 loans in the last year and a half and all of them have paid off when, in fact, you've only made 20 and 14 of them have gone into default. The point being that the theory of prosecution in this case was, and we said explicitly in our pretrial pleadings and in opening and in closing, is that whatever good intentions the defendants may have had when they started Maython, they hit a fork in the road when they started having defaults and they lied about material things about the investment that this Court has held time and again in Treadwell and Molinaro. Investors are entitled to a fair picture about why they're investing. Yes, but they're entitled to the rest of the picture, too. So it isn't a question, it seems to me, of trying the conservatorship as to whether the conservatorship followed up, because that would be a collateral issue, it seems to me, and I'd understand the judge not doing that. But it seems like they should have been able to come back at least to show that the conservators said at some point that there was $60 million worth, he thought there was $60 million worth of assets there and that he actually cleared apparently about $30 million and then apparently there was $14 million of his expenses, too. But normally when I've had a Ponzi scheme, there's zero. Right. And it seems to me, and maybe it was counsel's failure to push the trial judge, but it seems to me that the defense should have been able to show that at least the conservator thought there was $60 million there, because that's some evidence that it wasn't a complete sham, even though they were obviously lying down the line, but that would be something the defense could come back with. Otherwise, what have they got? I have two, I have a couple of responses to that. First, it's not accurate and the record doesn't support the notion that conservator Sell thought everything was worth $60. He explained during the post-trial proceedings related to restitution that he got appointed to take over this big mess of a financial company and when he took over, the first thing he did was look at the reports that the defendants had prepared and he said, well, they say it's worth $60 million. So in his initial report to the bankruptcy court, he said, it looks like it's worth $60 million. And then as he actually started investigating these things, he learned that all the collateral was screwed up. So that's point one. Point two is, separate from what conservator Sell may have thought about the collateral, there was an awful lot of evidence that the defendants were allowed to get in about their own subjective understanding about what the collateral was worth. And that's why this isn't a complete deprivation of a defense case. We cited some of that in our brief. Like, for example, Tim Abraham, the conservator, was cross-examined at extensive length by the defense about the fact that Maython's own internal spreadsheets purported to show that the collateral in this case was actually worth $600 million and that it was a really solvent fund and all of this stuff was valuable. Scott Johnson, the president, was asked on cross-examination and admitted that when he joined the company, he went through every file and looked in there and it appeared to him that there was an appraisal that supported the value of the underlying collateral. So whatever conservator Sell might have been able to offer about his initial mistaken reliance on their own documents, there was a whole lot of other evidence that had to do with collateral. Turning to the other issue briefly with respect to ineffective assistance of counsel, I disagree with counsel's statement that Dennis — Of course, this isn't the best point you have on that, the fact that there just isn't adequate record. That's something for the habeas. I agree. And some of the things that were said — Mr. Dichter came up here and said, well, Dennis Jones is now retired from the practice of law. He isn't on the CJA panel anymore and he's just sailing his boat. How do we know that stuff? That's not in the record. I don't think being able to go out and sail on a sailboat is good evidence of not being competent. Right. But in any event, this Court's case law is very — It's suggestive, isn't it? Yeah, right. This Court's law is very clear that habeas proceedings rather than direct appeals or new trial motions are the proper procedural vehicle for bringing ineffective assistance claims. No, but the point is that it's undisputed that he couldn't read. I — that is — that is decidedly disputed. And I point — we pointed out in our brief that in trial, exhibits are getting put up on the screen. We're reading in portions. We try to move on to the next exhibit. Mr. Jones jumps up and says, wait, wait, read the bottom, and then he reads it. When I was preparing last night, I found at least six different instances. I'll point the Court to one of them. It's on ER 241 and 242. He's examining a witness named Robbie Riggs. Well, how big is it on the screen, though? I mean, the statement is he can't read, period. It's not a question about he can't read certain font sizes. Pages 241, 242, Robbie Riggs, a witness, is being direct examined by Dennis Jones. He starts talking about a document. He says, I can't really recall it. Mr. Jones says, why don't I refresh your memory? He runs up, hands him an exhibit, and then at the bottom of page 241 starts reading from the document portions to refresh Robbie Riggs' recollection. I found at least six or seven examples of those just last night. I'm happy to go through them. But the point is, it is ipsy-dixit by the defense to say he can't read when time and again there are examples of Mr. Jones cross-examining witnesses by reading verbatim portions of very detailed financial contracts and getting him to – getting those witnesses to agree that they made certain admissions in there. The Court has no further questions. Thank you. Okay. Thank you. You're out of time. I'll give you a minute for a bottle each if you would like to take it. Your Honor, I checked the briefs. I did not find a citation to – an attempt to offer something because at that point the defense had been chastened and scared away from this issue. And so my point in final is that had the Court permitted this evidence, the same instruction would have been given about good faith and the jury would have had a chance to evaluate it and make its own determination. Here the district court took that from the jury. Thank you. Thank you. The usual ineffective assistance to counsel cases like a post-mortem or an accident reconstruction, the difference is, of course, this was ongoing and pointed out by the lawyer during the first trial and the second trial. And the first trial, obviously, his inadequacies were masked by the presence of Willinchek, the lawyer who was really a well-known litigator, who really took over the whole case, and obviously nobody got convicted. We used some trial-saver metrics in our brief. Some may ridicule me for doing that, but I think the government put on 85 percent of the witnesses, 85 percent of the direct, and the cross was less than 40 percent of what it had been in the first trial. First trial, no conviction. Second trial, they convict the two remaining defendants in either two hours or three hours, depending on who's counting. Counsel, what do we do with that, though? I mean, I've tried cases where we tried them three times. Right. And the third trial moves a whole lot faster than the first two did because everybody knows what the evidence is. Right. But listen, please, to what I said. No, no, it didn't. The government took the same amount of time to put on the same number of witnesses, less four. So the government put on 85 percent of the witnesses they put on in the first trial, and the transcript length of the direct examination by the government lawyers is 85 percent of what it was in the first trial. But is your position that Mr. Jones was hearing something in the second trial that he'd never heard in the first trial? My position is it didn't matter what he heard in the second trial. He was incapable of reacting to it because he didn't do the first trial. But the judge said in ruling on the motion for a new trial that he was influenced by the fact that the defense was in essence retrying the same case that they had had a dry run on during the first trial. No, but the judge didn't know. Then that just proves. Well, the judge said that. Well, the judge said a lot of things, Your Honor. But look at. Isn't that what the judge relied on in part when he said I've watched this lawyer now through two trials. I disagree. And I don't see deficient performance here. The trial was 40 percent shorter all on the defense side. It had nothing to do with the government. The government put on the same. Didn't one of the defendants plead out? Yeah, but that made no difference. They put on the same witnesses. They put on the same evidence. That's what I'm saying. Please. Eighty-five percent of the witnesses, 85 percent of the direct. It's the same. The government did put on the same trial the first time as the second time, and the defense didn't. Why? Because they were incapable of doing it. Why? Because the lawyer was not even able to read. If all he had done was read Dennis Willinchek's cross-examination of every witness, we would have probably gotten or might have gotten to the same result. Who can say we wouldn't have gotten to the same result in the first trial? That is a hung jury. Who knows what would have happened? What is the value of a chance? The guy couldn't read the transcripts. In other words, could he say the words? Yeah. Jump, jip, jump. See the dog jump. What does that mean? His brain was not understanding it. What's your response to Mr. Lanz's citation to the portions of the record where in the middle of examination of witnesses, counsel stands up, walks, asks to approach. Yeah. And points out a paragraph in the document. Right. And asks the witness to read it. So after, out of 5,000 documents, he points to four, five, or six examples where there was a moment of lucidity, a moment of able to read. So he could read 2 percent of the time, but 98 percent of the time he was blind? Well, I really believe that if you read Dr. Powers' medical evaluation of him, yeah, that's exactly what happens. But why shouldn't we send, if this is a viable issue, and it may be, why shouldn't we send it back to the district court for a full-blown evidentiary hearing on a properly filed habeas corpus petition? Well, I mean, the practical ramifications are that he probably doesn't wind up with a lawyer on a habeas unless somebody winds up appointing one for him, which is not at all likely to happen. His family and friends would scrape together some money to hire me, probably aren't going to be able to do that again, and he'll serve another couple of years in prison while that happens. But obviously we know that that is the normal result. This is an unusual case because, as was said, he couldn't read. I mean, really, he couldn't read. He couldn't read some of the time. He couldn't read most of the time. Kennedy But, before we have a Supreme Court that has condoned a lawyer sleeping through part of a trial, you just about need to have a separate hearing as opposed to the somewhat equivocal evidence in this case, don't you? Your Honor, I, you know, I understand what the weight of the law and the weight of custom and tradition in this circuit is, and if that's what's going to happen, obviously that's what's going to happen. The point I'm trying to make is that, and I thought about the asleep part, and I thought whether a clever remark would have, you know, might have been, well, I mean, if he had been asleep, what difference would have it made in this case? Or, another one would have been, well, even if the judge had let him put on the defense, this guy was incapable of putting on the defense. And I thought, well, that was nice. If the Ninth Circuit wants to say you lose because your lawyer wasn't competent enough in this case to be able to put on a defense, if the government had not helped the court find its way to not allow the defense, I guess I'll live with that ruling. I understand what the court is likely to do here. What I'm saying is, is that at the end of the day, and, yes, I had a sailboat forever, too, and I don't think you're incompetent if you're sailing. That's what I said in my opening. It may have been a better result for him. But the fact is, is that he's not on the panel. How do I know this? Okay, I confess. I know this because there was a letter from the Federal Defender's Office taking his cases away, and because I called Dennis and asked him if he was still practicing law, and he said he wasn't. So, yeah, it's not in the record. Sue me. Okay? Am I lying? I'm making that up? Thank you. Thank you, Mr. Dictor. Okay. Thank you. The case is argued. We'll stand for a minute.
judges: Piersol, Kozinski, Tallman